1

2

3

4

5

6

7

8  UNITED STATES DISTRICT COURT

9  CENTRAL DISTRICT OF CALIFORNIA

10

11  JEFFERY ETTER; SUSAN ETTER; PAUL KAHLER; FRAN CURTIS; MICHELLE CURTIS; LESLIE CRAWSHAW; RICHARD KAYLOR; BRIAN MCBRIDE; DENNIS OSHA; JAMES PEARCE; CRAIG POST; RAYMOND ROLLE, SR; EMIL VARGO; LEONARD SOMERVILLE; ORRENE SOMERVILLE; RICHARD SPEARS; ALICE KNIGHT; ALAN BURKHART; SANDRA BURKHART; GEORGE FREDERICK; KATHLEEN FREDERICK; ALAN GREAGER; and, LINDA GREAGER, individually, and on behalf of themselves and all others similarly situated,

19  Plaintiffs,

20  v.

21  THETFORD CORPORATION, a Delaware corporation; NORCOLD, INC., a Delaware corporation; THE DYSON-KISSNER-MORAN CORPORATION, a Delaware corporation; and, DOES 1 to 50, inclusive,

Defendants.

CASE NO. SACV 13-00081-JLS (RNB)

**ORDER GRANTING SETTLING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 502), GRANTING IN PART SETTLING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS (Doc. 479), AND GRANTING IN PART AND DENYING IN PART SETTLING AND NON-SETTLING PLAINTIFFS' MOTIONS FOR INCENTIVE AWARDS (Docs. 479, 495)**

**[REDACTED VERSION]**

12

13

14

15

16

17

18

22

23

24

25

26

27

28

1

1

2 | *This order also relates to the following related action:*

3 CHARLES CHOW, JOHN ROBINSON, RANDY DUPREE, RAY BURKHEAD,

4 LINDA PIERSON, and GORDON WILLIAMSON, individually, and on

5 behalf of themselves and all others similarly situated,

6

7 |                Plaintiffs,

8 |      v.

9 NORCOLD, INC., a Delaware corporation; THETFORD

10 CORPORATION, a Delaware corporation; THE DYSON-KISSNER-MORAN

11 CORPORATION, a Delaware corporation; and DOES 1 to 50, inclusive.

12 |                Defendants.

13

CASE NO. CV 14-06759-JLS (RNBx)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Before the Court is a Motion for Final Approval of the proposed Second Amended Settlement Agreement and certification of the settlement class.  (Final Approval Mot., Doc. 502.)  Also before the Court are opposing motions over attorneys' fees, costs, and incentive awards filed by Settling Plaintiffs James Pearce, Craig Post, George Frederick, Kathleen Frederick, John Robinson, Randy Dupree, Ray Burkhead, Linda Pierson, Charles Chow, and Gordon Williamson and Non-Settling Plaintiffs Jeffery Etter, Susan Etter, Fran Curtis, Michelle Curtis, Paul Kahler, Brian McBride, Richard Kaylor, and Emil Vargo. (Settling Plaintiffs' Mot., Doc. 480; Non-Settling Plaintiffs' Attorneys Fees and Costs Mot., Doc. 492; Non-Settling Plaintiffs' Incentive Award Mot., Doc. 495.)

I.       **BACKGROUND**

A.       **Procedural History**

On December 12, 2012, Non-Settling Plaintiffs Jeffery Etter, Susan Etter, Paul Kahler, Fran Curtis, and Michelle Curtis filed this putative class action in Orange County Superior Court, which Defendants removed to federal court on January 16, 2013.  (Notice of Removal, Doc. 1; Compl., Exh. A, Doc. 1.)  The complaint alleged that three models of Defendants' refrigerators designed for use in recreational vehicles — the twelve-cubic-foot model ("1200 Series"), the eight-cubic-foot model ("N8 Series"), and the six-cubic-foot model ("N6 Series") — would corrode, crack, and leak resulting in fires.  (FAC ¶ 3, Doc. 40.)  The First Amended Complaint included claims for (1) violation of consumer protection statutes, (2) breach of express warranty, (3) breach of implied warranty, (4) violation of the Song-Beverly Consumer Warranty Act, (5) violation of California's Unfair Competition Law, (6) restitution, (7) strict products liability, and (8) negligence.  (*Id.* ¶¶ 91-251.)  The First Amended Complaint added Settling Plaintiffs James Pearce, Craig Post, George Frederick, and Kathleen Frederick as well as Non-Settling Plaintiffs Richard Kaylor, Brian McBride, and Emil Vargo.  (FAC.)  Defendants submitted an answer on April 29, 2013.  (Answer, Doc. 41.)

To develop their case, Plaintiffs secured the testimony of averred experts in forensic engineering (Doc. 122), fire investigation (Doc. 123), and the National Highway and Transportation Safety Administration's (NHTSA) recall processes (Doc. 124). Defendants countered with their own expert witnesses. (Docs. 142, 143, 145, 148.) Plaintiffs served 206 requests for production — a few of which resulted in motions to compel (*see* Docs. 103, 105, 107, 130, and 168) — and ultimately reviewed over 166,000 pages of responsive documents. (Robinovitch Decl. ¶ 13, Doc. 480.)

On December 27, 2013, Plaintiffs filed their initial motion for class certification (Docs. 52, 64), which Defendants opposed (Doc. 73). On April 24, 2014, the Court struck the filings and vacated the hearing set for May 9, 2014 because the parties had not complied with Local Rule 7-3 or the Court's order limiting opening and opposition briefs to thirty-five pages. (Order Striking Filings, Doc. 116.) Plaintiffs renewed their motion for class certification on May 5, 2014. (Renewed Mot. for Class Cert., Doc. 117.)

As the Court's hearing on Plaintiffs' class certification motion neared, the parties entered mediation before Judge Carl West (Ret.) at JAMS in Los Angeles. (Robinovitch Decl. ¶ 17, Doc. 480.) The parties ultimately held six mediation sessions on June 4, 5, and 9, 2014 and July 7, 17, and 18, 2014. (*Id.*) Attorney Terrence Beard, one of the Plaintiffs' initial attorneys, broke from these mediation sessions, disagreeing with the settlement under negotiation. (*Id.* ¶ 21.) On June 26, 2014, Mr. Etter, after apparently speaking with Mr. Beard, sent the other named plaintiffs an email indicating his opposition to the settlement and proclaiming that he "would prefer to see Norcold / DKM in bankruptcy and out of business and just forget about accepting a check for $15 to $50 dollars. However, I felt an obligation to ask all of the Class Representatives as a group for your feelings and input regarding this matter." (Ridout Suppl. Decl. ¶¶ 24-29, Doc. 181; Etter Decl. ¶ 12, Doc. 203.)

On July 18, 2014, the settling parties reached a tentative settlement agreement as reflected in a terms sheet. (Ridout Suppl. Decl. ¶ 9, Doc. 181; Joint Stipulation to Suspend

4

Litigation, Doc. 172.)  While seventeen of the named plaintiffs signed this original Settlement Agreement, Plaintiffs Jeffery Etter, Susan Etter, Fran Curtis, Michelle Curtis, Brian McBride and Emil Vargo refused.  (*Id.* ¶ 13.)  The plaintiffs thus divided into two camps: the Settling Plaintiffs represented by Zimmerman Reed, LLP and Ridout Lyon + Ottoson, LLP — firms which subsequently merged — and the Non-Settling Plaintiffs represented by Mr. Beard.

On August 28, 2014, Settling Plaintiffs Charles Chow, Randy Dupree, and John Robinson[1] filed a substantially similar class action against Defendants (*Chow v. Norcold, Inc.*, Case No. SACV 14-6759-JLS (RNBx) (C.D. Cal)).  (*Chow* Compl., Doc. 1.)  In their First Amended Complaint, the *Chow* Plaintiffs assert claims against Defendants under (1) the New York's Consumer Protection from Deceptive Acts and Practices Statute, (2) the Michigan Consumer Protection Act, (3) the Ohio Consumer Sales Practices Act, (4) the Magnuson-Moss Warranty Act for breach of express warranty, (5) the Magnuson-Moss Warranty Act for breach of an implied warranties, (6) an express warranty theory, (7) an implied warranty theory, (8) the Song-Beverly Consumer Warranty Act, (9) California's Unfair Competition Law, and (10) a restitution theory.  (*Chow* FAC ¶¶ at 86-267, Doc. 11.)

On September 16, 2014, Settling Plaintiffs filed their Motion for Preliminary Approval (Mot., Doc. 196), which Non-Settling Plaintiffs opposed (Opp'n, Doc. 202).  On October 14, 2014, the Court denied without prejudice Settling Plaintiffs' Motion because the agreement did not include a non-conflicted N6 or N8 owner as one of the proposed class representatives and certain provisions related to incentive awards and individual settlements needed to be revised.  (Order at 9-13, Doc. 221.)

Settling Plaintiffs renewed their motion on November 7, 2014 (Mot., Doc. 228), and Non-Settling Plaintiffs again opposed the motion (Opp'n, Doc. 259).  Concurrent with

---

[1] Ray Burkhead, Linda Pierson and Gordon Williamson were added in the *Chow* First Amended Complaint.  (*See* Chow FAC, Doc. 11.)

their opposition to the settlement agreement, Non-Settling Plaintiffs sought leave to conduct additional discovery on Defendants' ability to withstand a larger settlement payment (Doc. 239), which Settling Plaintiffs opposed (Doc. 253).  The Court issued its order on December 9, 2014, indicating that, although the Non-Settling Plaintiffs' motion for additional discovery must be denied for failure to meet and confer, limited discovery on Defendants' financial health and applicable insurance coverage would be appropriate if Non-Settling Plaintiffs were to renew their motion before Magistrate Judge Block.  (Order at 7, Doc. 275.)  Magistrate Judge Block then oversaw additional discovery, which focused on the production of Defendants' financial reports, financing agreements, and insurance policies.  (Robinovitch Decl. ¶ 64, Doc. 480.)  Additionally, Non-Settling Plaintiffs deposed Jeffrey E. Brandlin, whom Settling Plaintiffs had retained as an expert on Defendants' financial health during settlement negotiations.  (Robinovitch Decl. ¶ 65; Brandlin Decl. ¶ 4, Doc. 315; Notice of Lodging, Doc. 321.)  Non-Settling Plaintiffs also retained their own averred expert, Joel Lesch.  (Notice of Lodging, Doc. 321.)

　　　　Based in part on this additional discovery, the Court denied Settling Plaintiffs' Motion for Preliminary Approval of the settlement and certification of the class.  (Second Denial Order, Doc. 402.)  The Court concluded that Settling Plaintiffs had not yet demonstrated that Defendants could not afford to pay more than $33 million over three years.  (*Id.* at 25-26.)  Yet, contrary to Non-Settling Plaintiffs' assertions, the Court found no indication that any of Defendants' insurance policies covered the putative class claims or that Defendants could afford to pay $20 to $40 million more per year.  (*Id.* at 19, 27.)  The Court also concluded that the proposed allocation of the settlement fund was too skewed in favor of the 1200 Series refrigerator owners and earlier individual settlement offers to a few proposed class representatives impaired their ability to adequately represent the class.  (*Id.* at 14-18.)  To remedy the potential conflict of interest, the Court suggested that the proposed class representatives either step aside or receive their individual

1    settlement payments before the filing of a motion for preliminary approval of the class

2    settlement.  (*Id.* at 13-14.)

3          After the Court's second denial of preliminary approval, Settling Plaintiffs returned

4    to settlement negotiations with Defendants using Judge West once more as mediator.

5    (Robinovitch Decl. ¶ 71, Doc. 480.)  Settling Plaintiffs ultimately reached a revised

6    agreement, which increased the settlement compensation by three million dollars (to $36

7    million) through a fourth installment payment.  (Settlement Agreement ("SA") § II.D(2)(i),

8    Doc. 412-1.)  The revised settlement agreement also removed the proposed class members

9    with potential conflicts of interest and increased the N6 and N8 Series owners' settlement

10   shares from three to five.  (*Id.* §§ II.D(1), VII.G.)

11         Meanwhile, on May 28, 2015, Steve Berman, Managing Partner at Hagens Berman

12   Sobol Shapiro, LLP filed an application to appear pro hac vice on behalf of Non-Settling

13   Plaintiffs Jeffery Etter and Susan Etter.  (Doc. 398.)  A few days later, on June 2, 2015,

14   Thomas E. Loeser, a partner at Hagens Berman, first entered an appearance on behalf of

15   Jeffery Etter and Susan Etter.  (Doc. 400.)  Two weeks later, in a letter to Zimmerman

16   Reed and Ridout Lyon + Ottoson, Mr. Berman and Mr. Beard stated their intention to file a

17   motion to appoint Hagens Berman and Mr. Beard as lead counsel unless Settling Plaintiffs'

18   counsel acceded to Hagens Berman and Mr. Beard serving as putative class co-counsel.

19   (Letter, Exh. B, Doc. 480-3.)

20         On September 4, 2014, Settling Plaintiffs filed their third motion for preliminary

21   approval of the settlement and conditional certification of the class (Doc. 411), and Non-

22   Settling Plaintiffs (now represented by Hagens Berman as well as Mr. Beard) again

23   opposed (Doc. 429).  After reviewing the extensive briefing provided by Settling and Non-

24   Settling Plaintiffs and holding a hearing on the matter (*see* Doc. 462), the Court identified

25   three remaining areas of further inquiry: (1) the evidentiary basis for concluding that the

26   1200 Series posed a greater fire risk; (2) the settlement's allotment of twenty-five

27   settlement shares to former 1200 Series owners who incurred out-of-pocket expenses,

28

7

regardless of how modest their expenses were; and (3) the need to distribute the proposed warning to all class members, instead of just those who submit claim forms (Doc. 448 at 1).  In response to the Court's concerns, Settling Plaintiffs submitted an addendum to the Second Revised Settlement Agreement, which established a tiered share allocation methodology for former 1200 Series owners and expanded the scale of the warning initiative to include all class members, regardless of whether they submit a claim.  (Second Revised Settlement Agreement Addendum, Doc. 447-1.)  With these amendments, the Court granted Settling Plaintiffs' Motion to provisionally certify the class and preliminarily approve the settlement.  (Preliminary Approval Order, Doc. 468.)

   **B.    The Settlement**

The settlement provides for a non-reversionary gross monetary fund of $36 million to be paid in four annual installments with each claimant receiving compensation in proportion to the claimant's allotment of settlement shares.  (SA §§ II.D(1)(i), D(2), D(5)(iii), Doc. 412-1.)  Current owners of 1200 Series Norcold refrigerators will receive twenty-five shares of the settlement.  (*Id.* § II.D(5)(ii)(a); Addendum § I.2(ii)(a).)  Former 1200 Series owners who do not claim that they incurred any repair or replacement costs will receive one share (Addendum § I.2(ii)(c)), while former 1200 Series owners who have incurred expenses would receive up to twenty-five shares based on the following formula:

| Aggregate Repair/Replacement Cost | Shares |
|---|---|
| Over $1,700.00 | 25 shares |
| From $1,360.01 to $1,700.00 | 20 shares |
| From $1,020.01 to $1,360.00 | 15 shares |
| From $680.01 to $1,020.00 | 10 shares |
| From $340.01 to $680.00 | 5 shares |
| From $68.01 to $340.00 | 3 shares |
| From $0.01 to $68.00 | 1 share |

(Addendum § I.2(ii)(b), Doc. 447-1.)  Current N6 and N8 Series owners will receive five shares.  (SA § II.D(5)(ii)(d).)  The claims administrator reports that 45,391 claims totaling approximately 785,149 shares have been filed.  (Robin Supp. Decl. ¶ 4, Doc. 517.) Assuming a maximum allocation of attorneys' fees and settlement administration costs, each share would thus be worth roughly $32.97; 1200 Series owners would receive around $824, while N6 and N8 owners would receive around $164.  (*Id.*)

Besides receiving five shares of the gross monetary settlement, N6 and N8 Series owners will receive an extended three-year warranty for cooling unit repairs, commencing either when their standard warranty expires or the settlement becomes effective (whichever day is later).  (SA § II.D(2)(viii).)  Class members need not submit a claim form to receive the warranty, and any disputes over the extended warranty coverage would be resolved by the Better Business Bureau or another third-party special master, with the special master's costs borne by Defendants unless the claim was frivolous or submitted for an improper purpose.  (*Id.* § II.D(2)(ix).)

The Settlement Agreement also obligates Defendants to provide the following safety warning to all eligible claimants — regardless of whether they submit a claim form — at the time of the first settlement disbursement:

**WARNING:**

Norcold has recalled all Model 1200 series refrigerators manufactured prior to October 6, 2010. The purpose of the recall is to remedy a safety related defect by installing a High Temperature Sensor (HTS). Therefore, if you own such a refrigerator and have not had the HTS installed, you should turn off your refrigerator immediately and call the Norcold Recall Department at (800) 767.9101 to make arrangements to have the HTS installed at no charge to you.

1   If the HTS has been installed and it trips (red light continuously lit), the
2   Refrigerator must always be brought in and checked by a trained technician.
3   It is imperative that you never bypass the HTS. Norcold had previously
4   recalled 6 cubic foot and 8 cubic foot refrigerators with serial numbers
5   1038000 to 1099000. If you own one of these refrigerators and you have not
6   had the original cooling unit replaced you should immediately turn off your
7   refrigerator and contact the Norcold Recall Department at 800.767.9101 to
8   make arrangements to have your original cooling unit replaced at no cost to
9   you.

10

11   It is essential that if you are experiencing cooling performance issues with
12   your Refrigerator you immediately take it to a dealer and have it checked by
13   a trained Technician.

14

15   FAILURE TO FOLLOW THESE INSTRUCTIONS CAN RESULT IN
16   FIRE, CAUSING PROPERTY DAMAGE, INJURY OR DEATH.

17

18   (*Id.* § II.D(1)(iii); Addendum § II.4.)  The Addendum also provides that a safety warning
19   shall be included on the class action website and short form notice, stating:

20

21   Warning: The lawsuits claim that Norcold 1200, N6 and N8 series gas
22   absorption refrigerators share a safety related defect in the cooling unit
23   which, in certain circumstances, causes the boiler tubes to corrode and leak
24   flammable gas, exposing consumers to the risk of fire. *It is essential that if*
25   *you are experiencing cooling performance issues with your Refrigerator, or*
26   *if you observe any yellow or green residue near the cooling unit, that you*

27

28

1  *immediately turn the unit off and take it to a dealer and have it checked by a*

2  *trained technician.*

3

4  (Addendum § II.5.)

5  The settlement class is defined in the agreement as:

6

7  All persons in the United States, who: (i) currently own, or formerly

8  owned, a Norcold 1200 Series Gas Absorption Refrigerator or

9  Cooling Unit that was manufactured during the time period starting

10  January 1, 2002 and continuing to and including October 1, 2012;

11  and/or (ii) currently own a Norcold N6 Series Gas Absorption

12  Refrigerator or Cooling Unit, or a Norcold N8 Series Gas Absorption

13  Refrigerator or Cooling Unit, manufactured during the time period

14  starting January 1, 2009, and continuing to and including December

15  31, 2013.

16

17  (SA § I.A(15).)  This settlement class definition differs from the definition provided in the

18  *Etter* Plaintiffs' First Amended Complaint in that it explicitly excludes those who

19  purchased their refrigerators before 2002 and, like the one provided in the *Chow*

20  Complaint, is a nationwide class.[2]  (*See* FAC ¶¶ 2-3, Doc. 40.)  This class definition covers

21  an estimated 575,433.6 class members: 117,343.35 current 1200 Series owners, 24,723

22  former 1200 Series owners with repair bills, 74,170 former 1200 series owners without

23

24  _____

25  [2] The *Etter* complaint sought relief on behalf of those who purchased or owned Norcold

26  N6, N8, or 1200 Series refrigerators in California, Florida, Texas, New York, Pennsylvania, Maryland, Tennessee, Mississippi, Oregon, North Carolina, Washington, Illinois, and Arizona.

27  (*Etter* FAC ¶¶ 1, 78, Docs. 40, 40-1).  In their class certification motion, Plaintiffs excluded Mississippi from their proposed class definition, reducing the number of proposed subclasses to

28  twelve.  (*See* Renewed Certification Motion at 1-2, Doc. 117.)

11

1  repair bills, and 359,197.25 current N6 and N8 owners.  (Norcold Monetary Fund
2  Estimated Payments, Exh. A, Doc. 413-1.)

3          In return for net settlement fund payments as well as the non-monetary
4  compensation, the class members agree to discharge the "Released Parties":

5

6              from any and all claims, demands, suits, petitions, liabilities, causes of action,
7              rights, and damages of any kind and/or type regarding the subject matter of
8              the Action, including, but not limited to, compensatory, exemplary, punitive,
9              expert, and/or attorneys' fees, or by multipliers, whether past, present, or
10             future, mature, or not yet mature, known or unknown, suspected or
11             unsuspected, contingent or non-contingent, derivative or direct, asserted or
12             unasserted, whether based on federal, state or local law, statute, ordinance,
13             regulation, code, contract, common law, or any other source, or any claim of
14             any kind related, arising from, related to, connected with, and/or in any way
15             involving the Action, the subject Gas Absorption Refrigerators, or cooling
16             units, that are, or could have been, defined, alleged or described in the
17             Litigation,  including,  but  not  limited  to,  the  design,  manufacturing,
18             advertising, testing, marketing, functionality, servicing, sale, lease or resale
19             of the subject Gas Absorption Refrigerators, or cooling units.

20

21  (*Id.* § VI.B.) The "Released Parties" include all of Defendants' "past, present and future
22  parents, predecessors, successors, spin-offs, assigns, holding companies, joint ventures and
23  joint venturers, partnerships and partners, members, divisions, stockholders,
24  bondholders, subsidiaries, related companies, affiliates, officers, directors, employees,
25  associates, dealers, representatives, suppliers, vendors, advertisers, service providers,
26  distributors and sub-distributors, agents, attorneys, administrators and advisors." (*Id.* §

27

28

1   I.A.60.)  Specifically carved out from the release are any personal injury, wrongful death,

2   or property damage claims.  (*Id.* § VI.C.)

3        The settlement provides that Plaintiffs' attorneys may request an award of

4   attorneys' fees and costs of up to one-quarter of the settlement fund.  (*Id.* § VII.B.)  To the

5   extent the Court does not approve the amount of attorneys' fees and costs sought, the funds

6   will remain a part of the net settlement fund to be distributed to claimants.  (*Id.* §

7   II.D(1)(i).)  The agreement allows Settling Plaintiffs and Class Representatives to receive

8   incentive payments of up to $7,500 each as determined by the Court.  (*Id.* § VII.E.)  Under

9   the agreement, Defendants have advanced the first two million dollars of the monetary

10  fund to the Claims Administrator, but any unearned administration fees will be returned to

11  class members.  (*Id.* §§ II.D(2)(iv), III.A.)

12       **C.**     **Notice and Response**

13       In accordance with the Court's Preliminary Approval Order, the claims

14  administrator, Kurtzman Carson Consultants ("KCC"), has provided notice to class

15  members through mailed and emailed short-form notices; advertisements in national,

16  general consumer, and RV-related newspapers; banner advertisements on RV-related

17  websites and Facebook; Google AdWords; an automated toll-free phone number; and a

18  class action settlement website.  (*See* Robin Decl., Doc. 505.)  The short-form notice

19  adequately describes the litigation and the scope of the class.  (Mailed Class Notice, Robin

20  Decl., Exh. A, Doc. 505; Emailed Class Notice, Robin Decl., Exh. B, Doc. 505.)

21  Additionally, the short-form notice explains (1) the amount and makeup of the Settlement

22  Fund; (2) the plan of allocation; (3) that Plaintiffs' Counsel and Plaintiffs will apply for

23  attorneys' fees, costs, and incentive awards; (4) the safety warning provided for in the

24  Settlement Addendum; and (5) class members' right to participate, opt out, or object to the

25  settlement.  (*See id.*)

26       On October 1, 2014, Defendant Norcold provided KKC with the names, addresses,

27  and Vehicle Identification Numbers of 167,475 persons identified as class members.

28

1  (Robin Decl. ¶ 3, Doc. 505.)  Norcold supplemented these data on April 7, 2016 to include

2  4,869 additional persons.  (*Id.*)  KKC used the U.S. Postal Service's National Change of

3  Address database to update the mailing addresses for 21,005 persons included on

4  Defendants' class member list.  (*Id*. ¶ 8.)  KKC also removed 3,264 duplicative records.

5  (*Id*. ¶ 4.)  On April 28, 2016, KKC emailed the short-form notice to 15,443 class members

6  who had a listed email address and mailed the notice to 152,263 potential class members

7  who did not have a listed email address.  (*Id*. ¶¶ 5-6.)  KKC then followed up by mailing

8  the short-form notice to 2,544 persons whose email notices were returned as undeliverable.

9  (*Id*. ¶ 7.)  Besides relying on the addresses in Defendants' class member list (as updated by

10  the USPS database), KKC obtained 178,759 names and addresses corresponding to the

11  Vehicle Identification Numbers provided by Norcold.  (*Id*. ¶¶ 8-9.)  After removing 70,753

12  duplicative records, KKC mailed the short-form notice to the 103,216 persons included in

13  this supplemental dataset.  (*Id*. ¶¶ 9, 11.)

14        For the 6,920 mailed Notices that the Postal Service returned with forwarding

15  addresses, KKC updated the class member dataset and, unless the class member had

16  already filed a claim, mailed an additional notice.  (*Id*.)  For the 35,298 notices returned

17  without a forwarding address, KKC was able to find updated addresses for 22,723 persons

18  through publicly-available databases.  (*Id*.)

19        KKC published advertisements in *USA Today* on April 22, 2016 and April 29, 2016,

20  the May and June issues of *COAST Magazine*, the August and September issues of

21  *MotorHome*, and the July and August issues of *TrailerLife*.  (*Id*. ¶¶ 13-16.)  Besides print

22  advertisements, the original notice campaign included fifty-nine million Facebook "banner

23  impressions" — approximately four million of which were targeted to potential RV owners

24  — as well as more than fifty million banner impressions on RV websites.  (*Id*. ¶¶ 18-19.)

25  KKC also purchased Google AdWords for keywords related to RV usage, RV furnishings,

26  RV refrigerators, Norcold, and particular brands of RVs. (*Id*. ¶¶ 25-27.)  During a

27

28

1 supplemental notice campaign, more than ten million additional banner impressions were

2 delivered on Facebook.  (*Id*. ¶ 28-33.)

3        The short-form notice, internet advertisements, periodical advertisements, and

4 Google Adwords directed consumers to the Norcold class action website

5 (www.norcoldclassaction.com).  (*See* Exhs. A-E, G-K, Doc. 505.)   This website provides

6 access to the Long-Form Notice, Warning Notice, Claim Form, the *Etter* and *Chow* First

7 Amended Complaints, Defendants' Answer to the *Etter* First Amended Complaint, the

8 Addendum to the Settlement Agreement, and the Court's Preliminary Approval Order.

9 (*Id*. ¶ 36.)  Class members could submit claim forms online or by mail.  (*Id*.)  The short-

10 form notice, many of the internet advertisements, and the periodical advertisements also

11 directed consumers to an automated telephone hotline that provided information about the

12 settlement agreement.  (*See* Exhs. A-E, G-K, Doc. 505.)   Finally, KKC issued a press

13 release directing readers to the website and telephone hotline and describing the class

14 action, class members, and class members' right to submit a claim, object, or opt out.

15 (Press Release, Exh. F, Doc. 505.)

16        KKC received 45,174 claims and thirty-seven opt-out requests by the postmark

17 deadline of August 26, 2016.  (Robin Supp. Decl. ¶¶ 2, 4, Doc. 510.)  Before disbursing

18 the settlement proceeds to these claimants, KKC will employ various anti-fraud measures.

19 (Robin Supp. Decl. ¶ 6.)  KKC received no timely objections (*Id*. ¶ 3), and the Court is

20 aware of only one objector besides the Non-Settling Plaintiffs.[3]  (Doc. 512.)  This objector,

21 an N6 Series owner, takes issue with the N6 and N8 Series owners' lesser allotment of

22 shares under the amended settlement agreement.  (*Id.*)

23

24

25

_____

26        [3] Another class member submitted a letter objecting to the proposed settlement agreement as well, but his letter indicates that he has already opted out.  (Letter, Doc. 511.)  Because a class

27 member who opts out of a Rule 23(b)(3) class action is not bound by a class settlement, he has "no standing to object . . . ."  *In re Vitamins Antitrust Class Actions,* 215 F.3d 26, 28-20 (D.C. Cir.

28 2000).

Settling Plaintiffs now seek final approval of the class action settlement, an award of attorneys' fees and expenses totaling one-fourth of the common fund, approval of $704,876.52 in settlement administration costs, and service awards for each class representative.  (Settling Plaintiffs' Mot., Doc. 479.)  Non-Settling Plaintiffs, in contrast, oppose final approval; seek to reduce the share of the common fund allotted to attorneys' fees and expenses to one-fifth; and request one-half of any attorneys' fees award, expenses totaling $81,821.61,[4] and incentive awards upwards of $7,500 for seven of the Non-Settling Plaintiffs.  (Non-Settling Plaintiffs' Attorneys' Fees and Costs Mot., Doc. 492; Opp'n Final Approval, Doc. 506; Non-Settling Plaintiffs' Incentive Awards Mot., Doc. 495; Supp. Mem. at 7, Doc. 533.)

## II.   CONDITIONAL CERTIFICATION OF THE CLASS

In its Preliminary Approval Order, the Court discussed the propriety of conditional class certification for the purposes of settlement.  (Prelim. Approval Order at 6-14, Doc. 468.)  The Court also discussed the adequacy of Settling Plaintiffs as Class Representatives and Settling Plaintiffs' Counsel as Class Counsel.  (*Id.* at 9-14.)  The Court sees no reason to depart from its previous conclusion regarding the existence of a proper settlement class, its appointment of Settling Plaintiffs as Class Representatives, or its appointment of Class Counsel.  The Court therefore incorporates its class certification analysis from the Preliminary Approval Order into this Order and GRANTS Settling Plaintiffs' Motion for final approval of the class certification for the purposes of settlement.

## III.   FINAL APPROVAL OF CLASS ACTION SETTLEMENT

### A.   Legal Standard

"[T]o protect the unnamed members of the class from unjust or unfair settlements affecting their rights," Rule 23(e) of the Federal Rules of Civil Procedure requires the Court to determine whether the proposed settlement is fair, reasonable, and adequate.  Fed.

---

[4] Non-Settling Plaintiffs initially requested $92,458.90 in expenses, but after Settling Plaintiffs raised concerns about certain charged items, Non-Settling Plaintiffs reduced their request to $81,821.61.  (Supp. Mem. at 4-7, Doc. 533.)

R. Civ. P. 23(e)(2); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) (citation omitted).  When examining whether a settlement satisfies this standard, the Court must consider "a number of factors, including:  [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (citation omitted).[5]  Beyond these factors, where "a settlement agreement is negotiated *prior* to formal class certification," the Court must also satisfy itself that "the settlement is not the product of collusion among the negotiating parties."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (internal citations omitted).  Accordingly, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *Id.* at 947.  Such signs include (1) "when counsel receive a disproportionate distribution of the settlement," (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds," and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.* (internal citations omitted).

"[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is 'exposed to the litigants, and their strategies, positions and proof.'"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (citation omitted).  "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each

---

[5] Factor [7], the presence of a governmental participant, does not apply to this case. *See, e.g.*, *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 455 (C.D. Cal. 2014).

1  individual case." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.

2  1982).  "It is the settlement taken as a whole, rather than the individual component parts,

3  that must be examined for overall fairness, and the settlement must stand or fall in its

4  entirety."  *Staton*, 327 F.3d at 960 (quoting *Hanlon*, 150 F.3d at 1026).

5       **B.**     <u>Discussion</u>

6       Settling Plaintiffs seek final approval of this class action settlement, describing it as

7  "an outstanding achievement in light of the numerous risks presented."  (Mem. Final

8  Approval at 1-2.)  Non-Settling Plaintiffs, on the other hand, ask this Court to deny final

9  approval because, they contend, the settlement provides insufficient compensation and

10  Settling Plaintiffs failed to provide adequate notice to class members.  (Opp'n Final

11  Approval at 6-17, Doc. 506.)  The Court finds that, on balance, the *Hanlon* factors favor

12  final approval of the proposed settlement and the settlement administrator's notice

13  campaign was entirely adequate.

14       **1.**     **Strength of Plaintiffs' Case**

15       Plaintiffs' lawsuit alleges that, due to shared defects, Norcold 1200, N8, and N6

16  Series refrigerators would corrode, crack, and leak resulting in fires.  (FAC ¶ 3, Doc. 40.)

17  While Settling Plaintiffs express confidence in their case, they recognize that it was far

18  from airtight.  (*See* Approval Mem. at 15-16, Doc. 502-1.)  Conversely, Non-Settling

19  Plaintiffs claim that, based on the additional discovery, Plaintiffs now have "overwhelming

20  evidence of liability against all three Defendants" and that any litigation risks are

21  "minimal." (Opp'n Final Approval at 10.)  The Court disagrees with Non-Settling

22  Plaintiffs' assertions.

23       As an initial matter, to prevail against Norcold's parents, Thetford and DKM,

24  Plaintiffs would have to demonstrate that the parents were the alter ego of Norcold — a

25  theory with tenuous support.  Courts consider a plaintiff's request to pierce the corporate

26  veil under an alter ego theory "with great caution and reluctance" and grant such a request

27  only "when (1) there is such a unity of interest and ownership that the separate

28

personalities of the corporations no longer exist and (2) circumstances exist so that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." 1 Fletcher Cyc. Corp. § 41.10.[6]   The Ninth Circuit has adopted the position that "[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001); *see Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1066-68 (C.D. Cal. 2002) (rejecting an alter ego theory when the parent provided financing to the subsidiary, some correspondence referred to the companies jointly as "us" or "our," and there was considerable overlap of senior leadership).  While Plaintiffs have evidence of financing arrangements, senior leadership overlap, and the parent entities' macro-management of Norcold (*see* Renewed Mot. Class Cert. at 30-33, Doc. 117; Non-Settling Plaintiffs' Opp'n at 10 n.8, Doc. 429), they lack substantial evidence of undercapitalization, comingling of assets, or failure to respect corporate formalities (Harris Decl. ¶¶ 3-12, Doc. 416; Defendants' Mem. at 5-20, Doc. 414).  *See Wady*, 216 F. Supp. 2d at 1067.  Accordingly — without resolving Plaintiffs' alter ego claim in this posture —the Court recognizes that Plaintiffs would need to surmount a formidable challenge to hold Thetford and DKM liable.  As a result, any award secured at trial would likely have to come from Norcold, which has much shallower pockets.

Even against Norcold, Plaintiffs would have to overcome Defendants' robust challenge to Plaintiffs' motion to certify the class along with probable motions for summary judgment.  As the Court noted in granting preliminary approval, "Given the complexity of this case and the evidentiary challenges that exist, success at each of these

---

[6] Whether California, Delaware, or some third state's substantive law would apply to Plaintiffs' alter ego theory is largely irrelevant here because most states have analogous standards. *See* Thomas R. Phinney, *The Trustee's Standing to Pursue Alter Ego Claims*, 26 Cal. Bankr. J. 214, 217 (2002) (noting the similarities); *see also Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122, 1128 (N.D. Cal. 2011) (applying the substantive law of the state of *incorporation* to an alter ego claim).

1    stages would be no small feat — and certainly not an inexpensive one." (Preliminary

2    Approval Order at 17, Doc. 468.)  Defendants' track record in fending off prior suits casts

3    further doubt on Plaintiffs' likelihood of ultimate success.  As Non-Settling Plaintiffs

4    recognize, "[u]p to 2010, [Defendants] had been universally successful in litigating claims

5    on an individual basis." (Non-Settling Plaintiffs' Mot. Attorneys' Fees and Costs at 5,

6    Doc. 492.)  Non-Settling Plaintiffs claim that, with the additional discovery garnered

7    through the *Reis v. Thetford Corp. et al.* individual action and this class action claim, their

8    proof is now "overwhelming." (*Id.* at 5.)  But the Non-Settling Plaintiffs' attorney Mr.

9    Terrence Beard brought his individual *Reis* suit to trial only to have a Contra Costa jury

10   find for the defendants. (Jury Verdict Form, Exh. 1, Doc. 503-1.)  Although the trial court

11   granted the plaintiff's motion for a new trial in *Reis* (Approval Mem. at 16, Doc. 502-1),

12   this incident confirms that Plaintiffs were by no means certain to secure victory at trial.

13   Accordingly, the Court finds that the considerable risks Plaintiffs would face if they

14   continued to litigate their case militate in favor of granting final approval.

15              **2.        Risk, Complexity, and Likely Duration of Further Litigation**

16         A "strong judicial policy . . . favors settlement[], particularly where complex class

17   action litigation is concerned." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th

18   Cir. 1998) (citation omitted).  Plaintiffs originally filed this case nearly four years ago on

19   December 12, 2012.  For Plaintiffs to secure anything through litigation, this highly-

20   complex case would have to continue for years through a renewed class certification

21   motion, a potential appeal of the class certification motion, summary judgment, trial, post-

22   trial motions, and appeals.  This timetable, of course, assumes that Norcold would not file

23   for bankruptcy, which would stay this suit indefinitely against, at the very least, Norcold[7]

24

25   _____

26        [7] Bankruptcy proceedings could be speedier than traditional litigation, but they would likely
     render the claims settled here unsecured and dischargeable. *See, e.g.*, *In re Jensen*, 995 F.2d 925,
27   930 (9th Cir. 1993); *In re Piper Aircraft Corp.*, 162 B.R. 619, 627 (Bankr. S.D. Fla.), *aff'd*, 168
     B.R. 434 (S.D. Fla. 1994), *aff'd as modified sub nom. Epstein v. Official Comm. of Unsecured
28   Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573 (11th Cir. 1995).

1   — the defendant most likely to be held liable at trial.  The potential for class members to

2   have to wait years more for any compensation, including having to navigate through

3   precarious bankruptcy proceedings, strongly weighs in favor of finding the settlement fair,

4   reasonable, and adequate.  *See, e.g.*, *Hightower v. JPMorgan Chase Bank, N.A.*, No. CV

5   11-1802 PSG (PLAx), 2015 WL 9664959, at *6 (C.D. Cal. Aug. 4, 2015).

6                   **3.    Risk of Maintaining Class Certification**

7           A closely-related factor concerns the likelihood that Plaintiffs could maintain class

8   certification through trial.  While the Court need not resolve Plaintiffs' class certification

9   motion in this posture, the Court does note that this action involves the substantive law of

10  twelve states (*see* Renewed Mot. Class Cert. at 21-30, Doc. 117; Opp'n to Renewed Mot.

11  Class Cert. at 22-27, Doc. 134), while the *Chow* complaint rests on one state's substantive

12  law applying to all members (*see Chow* Complaint).  Besides the predominance concerns

13  inherent in the certification of these kinds of multijurisdictional and nationwide class suits,

14  Plaintiffs' attempt to certify twelve subclasses compounds the risk that Plaintiffs will not

15  have adequate representatives for each of the subclasses through trial.  This concern is not

16  merely hypothetical: during these proceedings, two named plaintiffs have passed away

17  (Dennis Osha and Sandra Burkhart) and another has become unavailable (Les Crawshaw).

18  (Robinovitch Decl. ¶ 27, Doc. 480.)  Thus, the Court concludes that the non-negligible risk

19  that a class certification motion would be denied, at least in part, or that the class would

20  later be decertified supports a finding that the settlement is fair, reasonable, and adequate.

21  *See In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit Transactions Act (FACTA)*

22  *Litig.*, 295 F.R.D. 438, 452 (C.D. Cal. 2014).

23                   **4.    Amount Offered in Settlement**

24          Whether a settlement is adequately funded is not a question that should be analyzed

25  in a vacuum, divorced from the circumstances particular to the case at hand.  *See In re Am.*

26  *Apparel, Inc. S'holder Litig.*, No. CV-1006352 (MMM) (JCGx), 2014 WL 10212865, at

27  *11-12 (C.D. Cal. July 28, 2014).  In some class actions — where the plaintiffs have a

28

1  relatively strong case on the merits, no significant impediments to class certification, and

2  defendants able to fulfill any judgment secured at trial — the defendants' maximum

3  potential liability may provide an appropriate benchmark to evaluate the sufficiency of a

4  settlement's compensation.  When one or all of these factors are lacking, however, the

5  mere *possibility* of an enormous judgement carries little weight in determining whether a

6  settlement is fair, reasonable, and adequate.  Thus, a "settlement amounting to only a

7  fraction of the potential recovery does not per se render the settlement inadequate or

8  unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation

9  omitted).  Besides closely examining the strengths and weaknesses of the particular case at

10  issue, a court must appreciate that "the very essence of a settlement is compromise, a

11  yielding of absolutes and an abandoning of highest hopes."  *Officers for Justice*, 688 F.2d

12  at 624 (citation omitted).  And a motion for final approval cannot be denied based on wild

13  speculation about what "*might* have been achieved by the negotiators."  *Id.* at 625

14  (emphasis added).

15         In its previous order denying preliminary certification, the Court observed that the

16  "Defendants' . . . ability to pay a higher settlement amount [is] a significant factor" in

17  whether to approve the settlement.  (Order at 25, Doc. 402.)  On the briefing before it, the

18  Court found that Settling Plaintiffs had not sufficiently demonstrated that Defendants

19  could not withstand a higher settlement award, yet the Court also recognized that, because

20  of the "considerable risks facing all of the parties should this case proceed to the class

21  certification stage and ultimately to trial[,] . . . it is reasonable that a settlement agreement

22  would provide for far less compensation than the $700 million that Plaintiffs are seeking

23  from Defendants."  (*Id.*)  After the Court denied preliminary approval, the settling parties

24  returned to negotiations and reached a revised settlement that increases the monetary fund

25  by three million dollars through a fourth annual payment.  (SA § II.D(2)(i), Doc. 412-1.)

26         Settling Plaintiffs have demonstrated that this enhanced settlement sum satisfies

27  Rule 23(e).  Plaintiffs' demand for over $700 million in damages is ███ more than

28

1  Thetford's consolidated revenues in 2013 and ▮▮▮▮ greater than DKM's consolidated

2  revenues in 2013.  (Brandlin Decl. ¶ 16, Doc. 362.)  These revenue projections of

3  Norcold's parents, of course, are only relevant if Plaintiffs succeeded in their alter ego

4  claims.  Otherwise, Plaintiffs would have to collect from Norcold, which in 2013 reported

5  ▮▮▮▮▮▮ in revenue, ▮▮▮▮▮▮ in net income, and ▮▮▮▮▮▮ in total assets.  (*Id.* ¶

6  52.)  And, although potential insurance coverage was originally one of Non-Settling

7  Plaintiffs' primary arguments against the proposed settlement, at this point, Non-Settling

8  Plaintiffs do not dispute that Defendants have no insurance policy that would cover the

9  claims brought here.  Because of its limited financial resources as well as the need to make

10  strategic investments to remain competitive, Norcold indicates that it cannot satisfy this

11  thirty-six million-dollar proposed settlement, much less a $700 million judgement.

12  (Phillips Decl. ¶ 4, Doc. 419; Farnan Decl. ¶ 6, Doc. 418.)  Norcold is thus relying on its

13  parents, Thetford and DKM, to lend it sufficient funds, and these parents have expressed

14  no interest in lending additional amounts.  (Phillips Decl. ¶¶ 4, 7, Farnan Decl. ¶ 6, Doc.

15  418.)  Even if these parents were willing to contribute more, a larger settlement would also

16  increase the risk of Thetford and DKM breaching the Fixed Charge Coverage Ratio loan

17  covenant in their Revolving Credit, Term Loan and Security Agreement.  (Brandlin Decl.

18  ¶¶ 8, 10, 43, 48, Doc. 362.)

19        Yet perhaps the greatest concern for class members is that Norcold could employ a

20  strategic bankruptcy filing to curtail its liability.  Considering its limited financial

21  resources, Norcold lacks the ability to pay anywhere near a 700 million-dollar judgment,

22  raising the prospect the company would seek to file for bankruptcy if an unfavorable

23  verdict became more likely.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮  Courts have adopted two, essentially analogous standards for determining

28

1   what constitutes a claim under 11 U.S.C. § 101(5): the "prepetition relationship test" and

2   the "conduct test."  *See In re Jensen*, 995 F.2d 925, 930 (9th Cir. 1993); *In re Ritter Ranch*

3   *Dev.*, L.L.C., 255 B.R. 760, 765 (B.A.P. 9th Cir. 2000); *Aimee Raimer, What's in A*

4   *Claim?: Utilizing the Bankruptcy Conduct and Pre-Petition Relationship Tests to Evaluate*

5   *Existing Claims Against A Terminated Filing Entity*, 66 Baylor L. Rev. 760, 774-75

6   (2014).  Under either test, Norcold would likely be able to discharge the claims brought

7   here in bankruptcy proceedings.

8           Finally, the amount of the settlement also appears fair, reasonable, and adequate in

9   light of the claims released by Plaintiffs and settlement class members.  Explicitly

10  excluded from the settlement are any claims for property damage, personal injury, or

11  wrongful death.  (SA § VI.C.)  *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir.

12  2010) ("A settlement agreement may preclude a party from bringing a related claim in the

13  future even though the claim was not presented and might not have been presentable in the

14  class action, but only where the released claim is based on the identical factual predicate as

15  that underlying the claims in the settled class action." (citation omitted)).

16          For all these reasons, the Court concludes that the amount offered in settlement

17  appears reasonable, and — as a "significant factor" in the Court's analysis — weighs

18  heavily in favor of final approval.

19                      **5.      Stage of the Proceedings and Extent of Discovery Completed**

20          The Court considers the stage of this suit and extent of discovery completed to

21  evaluate whether "the parties have sufficient information to make an informed decision

22  about settlement."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (citation omitted).

23  Here, Settling Plaintiffs reviewed over 166,995 pages of responsive documents, retained

24  experts on the merits of their claims and Defendants' financial strength, took numerous

25  depositions, and served the maximum number of interrogatories.  (Robinovitch Decl. ¶¶

26  11-13, Doc. 480.)  Several of the discovery requests led to motions to compel.  (*See* Docs.

27  103, 105, 107, 130.)  During the additional discovery granted by the Court, both Settling

28

Plaintiffs and Non-Settling Plaintiffs examined the Defendants' fiscal health and insurance policies and deposed the other group's proffered financial expert.  The parties, therefore, "ha[ve] sufficiently developed the record" for the Court to be confident that Settling Plaintiffs can "make an informed decision about settlement."[8]  *Roberti v. OSI Sys., Inc.*, No. CV-13-09174 (MWF) (MRW), 2015 WL 8329916, at *5 (C.D. Cal. Dec. 8, 2015).

### 6.      Experience and Views of Counsel

When evaluating whether a settlement satisfies Rule 23(e), "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 (MMM) (JCGx), 2014 WL 10212865, at *14 (C.D. Cal. July 28, 2014) (citation omitted); *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at *4 (N.D. Cal. Feb. 2, 2009) (citation omitted).  This presumption is based on the reasonable expectation that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."  *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Settling Plaintiffs' lead counsel collectively have decades of experience litigating class actions and mass torts, serve on the steering committees for numerous MDL proceedings, and have been highly involved in litigating this suit.  (*See* First Robinovitch Decl. ¶¶ 7-20, Doc. 185; Ridout Decl. ¶ 11-17, Doc. 186.)  Their endorsement of the settlement as fair, reasonable, and adequate deserves careful consideration.  (*See* Mem. at 14-22, Doc. 502-1.)

The Court, however, cannot overlook that one of the attorneys involved in this suit from its commencement now vigorously opposes the settlement agreement.  Around July 2014, Terrence A. Beard broke from counsel for Settling Plaintiffs and initiated what

---

[8] Non-Settling Plaintiffs assert that the extensive discovery conducted in this suit weighs in favor of denying the settlement because "[t]he case is ready . . . to proceed to class certification and trial in the next six to nine months."  (Opp'n Final Approval at 13, Doc. 506.)  Not only are Non-Settling Plaintiffs incorrect to posit that this factor favors *denying* approval when the parties are *better* informed about the merits of their case, but also, for the reasons elaborated earlier, there is simply no way the parties could have a trial in this case within nine months.

would become a lengthy series of objections to the proposed settlement.  (Notice of Intent to Object, Doc. 176; Robinovitch Decl. ¶ 17, Doc. 480.)  Mr. Beard's current concerns about the settlement agreement are twofold: He believes that the settlement agreement unfairly narrows the class definition and provides inadequate compensation to class members.  (Opp'n Final Approval at 2-4, 6-7, Doc. 506.)  The Court finds both objections unpersuasive.

While acknowledging that "the new [class] definition presumably means that the individuals who fall outside the new class definition also fall outside the scope of the release," Mr. Beard asserts that "the risk of prejudice remains" because defendants may raise statutes of limitations or repose defenses.  (Opp'n Final Approval at 3, Doc. 506.)  Yet Non-Settling Plaintiffs fail to note that the *Etter* class definition never explicitly stretched back to 1996, but rather extended as far back as the longest statute of limitations.  (*Etter* FAC ¶ 78, Doc. 40.)  There is no indication that any of the applicable statutes of limitations would be sixteen years long.  In any event, class definitions are often modified for purposes of settlement.  *See, e.g.*, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 326 (3d Cir. 1998); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1018 (9th Cir. 1998); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 332 (C.D. Cal. 2016); *Medearis v. Or. Teamster Emp'r Tr.*, No. CV. 07-723-PK, 2009 WL 1788183, at *2 (D. Or. June 19, 2009).  Here, it was fair and reasonable to define the settlement class using a bright line date of January 1, 2002 for 1200 Series owners.  The Court will retain jurisdiction over the claims of any named Plaintiffs who purchased their 1200 Series refrigerators before 2002, and there is no evidence that unnamed owners of pre-2002 1200 Series refrigerators have relied on this suit in substantial numbers.  Those excluded from this class definition are also not subject to the release, so "they retain all their rights against Defendants."  (Preliminary Approval Order at 21, Doc. 468.)

Not only are those outside the settlement class definition unharmed by this agreement, they may benefit from *American Pipe* tolling, depending on whether the state

whose substantive law governs the claim has adopted *American Pipe* tolling and applies it

across jurisdictions and to statutes of repose (if the particular claim is governed by a statute

of response).  *See* 1 McLaughlin on Class Actions § 3:15 (13th ed.) ("The few state courts

to consider recognition of 'cross-jurisdictional' tolling under which a class action

commenced in one jurisdiction (federal court or a different state) tolls the statute of

limitations for individual claims later commenced in another jurisdiction, have reached no

consensus."); *see also, e.g., Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir.

2011), *certified question answered*, 254 P.3d 360 (Az. 2011); *Centaur Classic Convertible

Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 878 F. Supp. 2d 1009, 1017 (C.D. Cal.

2011); *see also Biotechnology Value Fund, L.P. v. Celera Corp.*, 12 F. Supp. 3d 1194,

1200 (N.D. Cal. 2013) (applying *American Pipe* tolling after a previous class action ended

in a settlement agreement).  To the extent that Non-Settling Plaintiffs' argument is that the

twelve states addressed in *Etter* may not apply *American Pipe* tolling as broadly as they

would like, such concerns are by no means limited to this settlement and their recourse lies

with those states' courts and legislatures.

Non-Settling Counsel's concerns with the settlement amount and how it is allocated

among class members are equally unavailing.  The Court has already concluded, both here

and in its earlier Preliminary Approval Order, that the amount offered in settlement is fair,

reasonable, and adequate.  (*See supra*, at 21-24.)  On the settlement apportionment, Non-

Settling Plaintiffs want a degree of mathematical precision in the allocation of shares

between former and current 1200 Series owners and N6 and N8 Series owners that Rule

23(e) does not mandate.  *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377–78

(9th Cir. 1993); *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001); *In

re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab.

Litig.*, No. 8:10ML 02151 JVS (FMOx), 2013 WL 3224585, at *19 (C.D. Cal. June 17,

2013).  Although any difference in compensation must be based on the "comparative

strengths and weaknesses of the asserted legal claims," *In re Holocaust Victim Assets*

*Litig.*, 413 F.3d at 186, the Court need not "resolve trial-type issues of liability" or reach beyond "the undisputed facts before [it]," *Curtiss-Wright Corp. v. Helfand*, 687 F.2d 171, 174 (7th Cir. 1982).  The Settling Plaintiffs have thoroughly explained that the 1200 Series owners receive more shares under this settlement agreement because the incident rate for 1200 Series refrigerators is much higher and these refrigerators are more expensive to replace.  (*See* Keifer Decl., Incident Reports at 44-197; Exhs. H & I, Doc. 122-2; Marker Decl. ¶¶ 8-12, Doc. 187; Marker Decl. Renewed Mot ¶¶ 8-12, Doc. 413, Settling Plaintiffs' Supp. Mem. Renewed Mot. at 1-4, Doc. 449.)[9]  Likewise, the former 1200 Series owners' diminished value claims were included in settlement agreement because they were part of Plaintiffs' complaint and raised by Plaintiffs during discovery.  (*See* Reply at 13-14, Doc. 518; FAC ¶ 1; Etter Dep. at 123, Doc. 519-5.)  The Court need not secure "an economist or other expert," as Non-Settling Plaintiffs propose (Opp'n Final Approval at 8), to recognize that the agreement fairly, reasonably, and adequately allocates shares based on the "relative deservedness" of the former and current 1200 series refrigerator owners.  *See Curtiss-Wright Corp.*, 687 F.2d at 174.

The Court is also no longer convinced that Non-Settling Counsel's objections to the settlement are unclouded by personal interests.  In an email exchange with Hart Robinovitch, Mr. Beard proposed to drop his clients' objections to final approval of the settlement if Zimmerman Reed would allocate forty percent of a maximum attorneys' fees award to Non-Settling Counsel.  (Email, Exh. D, Doc. 480-5.)  In one email, Mr. Beard offered numerous reasons why Settling Plaintiffs should pay him off; for example, "[i]f the NSP do not pursue an appeal, it is extremely unlikely that anyone else will have the breadth of appellate issues, supporting documentation and financial resources to pursue

---

[9] Non-Settling Counsel's concerns with the safety warning lack merit.  The proposed warning — which will be provided to class members regardless of whether they submit a claim form — adequately advises them to seek the assistance of a trained technician if they are experiencing cooling performance concerns with their refrigerators.  (SA § II.D(1)(iii).)  It is not intended to be an admission of liability.

one on their own." (*Id.*)  While describing his clients' objections as "meritorious," Counsel elaborated that a "gentlemen's agreement[]" would be "right up ZR's alley" and ended by summarizing his offer:

> I've done the math.  Whether we agree to a 60/40 split of a $9M fee, or I and HBSS fight to get a 50% or more share of a smaller fee – I'm good either way.  Can ZR say the same?  So, instead of pretending like you don't know what I am talking about, I suggest that you sit down with your partners and a calculator, and play out the alternate scenarios outlined above. Then get back to me by close of business next Friday with a serious response to my proposal.

(*Id.*)  If this settlement were truly — as Mr. Beard claims — one that "tends to hold the judiciary in disrepute" and confirms that "the system is rigged" (Opp'n Final Approval at 16, Doc. 506), it is unclear why counsel would be willing to drop his clients' objections for a greater share of attorneys' fees.

Raising further questions, Mr. Beard's current objections to the settlement contradict positions he took earlier in this suit.  For instance, Mr. Beard currently claims N6 and N8 refrigerators receive too *few* shares under the current settlement (Opp'n Final Approval at 9, Doc. 506), but in a previous objection, Non-Settling Counsel championed a hypothetical alternative settlement awarding *no* monetary compensation to N6 and N8 Series owners (Non-Settling Plaintiffs' Opp'n at 20-21, Doc. 429).  Likewise, Mr. Beard helped draft the *Etter* Complaint, which includes the diminished value claims of former 1200 Series owners (*Etter* FAC ¶ 29, Doc. 40), but now asserts that former 1200 Series owners should receive nothing (Opp'n Final Approval at 8, Doc. 506) and has gone so far as to postulate that these class members lack Article III standing to bring suit (Non-Settling Plaintiffs' Opp'n at 12, Doc. 429).

1    Having carefully examined — and thoroughly rejected — the arguments raised by

2  Non-Settling Plaintiffs' Counsel, the Court concludes that the persuasive reasoning of

3  Settling Plaintiffs' attorneys should be given greater weight and this factor favors granting

4  final approval.

5        **7.    Reaction of Class Members to Proposed Settlement**

6    As discussed earlier, KKC implemented a multiplatform notice campaign that

7  included delivering approximately 258,347 notices, publishing advertisements online and

8  in print publications, purchasing Google AdWords, and launching a website and telephone

9  hotline.  As a result of this notice campaign, KKC received 45,174 timely claims and

10  thirty-seven requests for exclusion.  (Robin Supp. Decl. ¶¶ 2, 4, Doc. 510.)  Besides Non-

11  Settling Plaintiffs, there is only one valid objection from a class member who detailed how

12  his N6 ceased cooling and needed replacement.  (Oxley Letter, Doc. 512.)  While "glad

13  that the class action is proceeding to a conclusion," the objector believes that the

14  settlement does not treat the N6 or N8 subclasses equitably.  (*Id.*)  He also wishes to

15  receive further information about the extended three-year warranty.  (*Id.*)  It is unclear

16  whether the objector's refrigerator cooling failure could possibly relate to the defects

17  alleged in this suit.  Regardless, the Court has concluded that the lesser share allocations

18  for the N6 and N8 owners is sensibly based on the considerably lower incident rates and

19  cost of these refrigerators.

20    There is no requirement that all named plaintiffs favor a settlement for it to be fair,

21  reasonable, and adequate.  *See, e.g.*, *Officers for Justice v. Civil Serv. Comm'n of City &*

22  *Cty. of San Francisco*, 688 F.2d 615, 631 (9th Cir. 1982); *Torrisi v. Tucson Elec. Power*

23  *Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993); *Rodriguez v. W. Pub. Corp.*, No. CV05-3222 R

24  (MCX), 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007), *aff'd in part, rev'd in part*

25  *sub nom. Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009).  To hold otherwise

26  would "encourage strategic behavior by representatives of named plaintiffs or classes,

27  designed to maximize the value of the veto rather than the settlement value of their

28

30

1  claims." *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1366 (2d Cir. 1991).  For

2  instance, a named plaintiff could hold out until the settling parties award him a higher

3  proportion of attorneys' fees — as is evidently the case here.  Thus, while the Court takes

4  into consideration Non-Settling Plaintiffs' objections, their dissent — on its own — is not

5  dispositive evidence of whether there is widespread dissatisfaction among class members

6  or whether a settlement more broadly satisfies the requirements of Rule 23(e).

7          Mr. Etter in particular has also repeatedly championed positions adverse to the

8  financial interests of the class.  When breaking away from the Settling Plaintiffs, Etter

9  wrote in an email to the other named plaintiffs that he "would prefer to see Norcold / DKM

10  in bankruptcy and out of business and just forget about accepting a check for $15 to $50

11  dollars."  (Ridout Decl. ¶ 8, Doc. 181; Etter Decl. ¶ 12, Doc. 203.)  Similarly, after the

12  Court granted preliminary approval, Mr. Etter wrote in an online RV forum that he

13  believed the averred threat the refrigerators posed was "[w]orth putting Norcold out of

14  business if they refused to do the right thing."  (Forum Post at 10, Exh. I, Doc. 480-10.)

15          In *Rodriguez v. West Publishing Corp.*, the Ninth Circuit concluded that it was

16  within the district court's discretion to find class members had reacted favorably to a

17  settlement when, after notice was provided to 376,301 class members, 52,000 submitted

18  claims while only fifty-four submitted objections.  563 F.3d 948, 967 (9th Cir. 2009).

19  Three of the objectors in *Rodriguez* were named plaintiffs.  *See Rodriguez v. W. Publ'g*

20  *Corp.*, No. CV05-3222 R (MCX), 2007 WL 2827379, at *2 (C.D. Cal. Sept. 10, 2007),

21  *aff'd in part, rev'd in part*, 563 F.3d 948 (9th Cir. 2009).  Here, the class reaction is

22  substantially more favorable than *Rodriguez.*  After mailing 258,347 notices and

23  embarking on a multiplatform advertising campaign, there were 45,391 claims, only thirty-

24  seven opt-outs, and just one objector besides the eight Non-Settling Plaintiffs.  (Robin

25  Supp. Decl. ¶¶ 2, 4, Doc. 510; Oxley Letter, Doc. 512.)  Like in *Rodriguez*, the Court,

26  therefore, concludes that the minimal number of objections and opt-outs suggests a

27  favorable reaction of the class.  *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577

28

31

1  (9th Cir. 2004) (holding that 500 opt outs and 45 objections after notifying 90,000 class

2  members favored approving settlement); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d

3  1036, 1043 (N.D. Cal. 2008) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,

4  221 F.R.D. 523, 528-29 (C.D. Cal. 2004)).  This factor, therefore, weighs in favor of final

5  approval of the settlement agreement.

6            **8.      Signs of Collusion**

7            Because there is "an even greater potential for a breach of fiduciary duty" when a

8  class action is settled before certification, a reviewing court must apply the *Churchill*

9  factors with "an even higher level of scrutiny . . . than is ordinarily required under Rule

10  23(e) . . . ."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 946.  Indicia of

11  implicit collusion include — but are by no means limited to — a disproportionate

12  allocation of settlement funds to attorneys' fees, a clear-sailing provision, or a provision

13  returning any unawarded funds to the defendants.  *Id.* at 947.  The Court does not believe

14  that the settlement is the product of explicit or tacit collusion.

15            This Second Amended Settlement Agreement is the product of an exhaustive,

16  iterative process: The parties reached the agreement through multiple rounds of contested

17  negotiations before the Honorable Carl West (Ret.).  (Robinovitch Decl. ¶ 71, Doc. 480.)

18  Twice the Court denied preliminary approval of the settlement because of deficiencies

19  needing remediation.  And, at every turn, Non-Settling Plaintiffs have challenged Settling

20  Plaintiffs, identifying every conceivable flaw with the agreement.  The Court allowed Non-

21  Settling Plaintiffs to conduct additional discovery of Norcold's financial strength,

22  including an examination of any potentially relevant insurance policies and financial

23  documents.  (Robinovitch Decl. ¶ 64, Doc. 480.)  Non-Settling Plaintiffs and Settling

24  Plaintiffs each offered financial experts to the Court, and Non-Settling Plaintiffs were

25  allowed to depose Settling Plaintiffs' expert, Mr. Brandlin.  (Robinovitch Decl. ¶ 65;

26  Brandlin Decl. ¶ 4, Doc. 315; Notice of Lodging, Doc. 321.)

27

28

1   Like the process employed, the agreement itself does not bear any of the hallmarks

2   of collusion.  Contrary to Non-Settling Plaintiffs' assertion, the agreement has no "clear

3   sailing provision," which is typically defined as a covenant by the defendants not to object

4   to an attorneys' fees request up to a specified amount.  *See In re Bluetooth Headset Prod.*

5   *Liab. Litig.*, 654 F.3d at 947.  The settlement provision the Non-Settling Plaintiffs' are

6   referencing merely caps all requests for attorneys' fees at no more than twenty-five percent

7   of the monetary fund.  (SA § VII.B.)  Under this provision, any attorneys' fees award will

8   be determined by this Court and will not be disproportionate to the class's monetary

9   compensation.  Any fees that this Court chooses not to award will remain in the monetary

10  fund to be disbursed to class members and any uncashed checks will be delivered to the *cy*

11  *pres* beneficiary, Public Citizen.  (*Id.* §§ II.D(1)(i), II.D(2)(vi).)  As such, the Court finds

12  that there are no signs — overt or subtle — that Settling Plaintiffs' Counsel have strayed

13  from their fiduciary duties to the class.

14          **9.      Conclusion as to Final Approval of the Settlement**

15  Any credible examination of whether a settlement is fair, reasonable, and adequate

16  must take into consideration the risks attendant with continuing to litigate through trial.  In

17  this case, Plaintiffs were not only beset with difficulties in establishing Defendants'

18  liability in a manner consistent with Rule 23, but also faced the very real prospect that they

19  would never collect anything remotely approaching what they demanded.  In light of these

20  risks, the Court concludes that the settlement is fair, reasonable, and adequate.

21  Accordingly, the Court OVERRULES Non-Settling Plaintiffs and Mr. Oxley's objections

22  and GRANTS Settling Plaintiffs' Motion for Final Approval of the Second Amended

23  Settlement Agreement.

24          **C. <u>Adequacy of Notice</u>**

25  Under Rule 23(e)(1), notice of a settlement must be provided "in a reasonable

26  manner to all class members who would be bound by the proposal."  Fed. R. Civ. P.

27  23(e)(1); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009).  When a class

28

1    is certified, the notice must be "the best notice that is practicable under the circumstances,

2    including individual notice to all members who can be identified through reasonable

3    effort." Fed. R. Civ. P. 23(c)(2)(B); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566,

4    575 (9th Cir. 2004); *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 452 (E.D. Cal.

5    2013). This standard does not mandate that all class members actually receive notice. *In*

6    *re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 585 (N.D. Cal. 2015). A notice provides

7    adequate information if it "generally describes the terms of the settlement in sufficient

8    detail to alert those with adverse viewpoints to investigate and to come forward and be

9    heard." *Churchill Vill., L.L.C.*, 361 F.3d at 575 (citation omitted).

10          As discussed extensively above, KKC employed a multiplatform, comprehensive

11   notice campaign that included direct individual notices, print and internet advertisements, a

12   class action website, and a telephone hotline. Nevertheless, Non-Plaintiffs object to the

13   notice campaign because, they posit, "RV owners . . . tend to be older, retired, less

14   computer savvy, and often times living in areas with little or no internet access." (Opp'n

15   Final Approval at 16, Doc. 506.) The reliance on internet-based advertising, Non-Settling

16   Plaintiffs argue, did not appropriately cater to these class members. (*See id.*) Further,

17   Non-Settling Plaintiffs protest that the short-form notice should have been mailed as a

18   letter, rather than a postcard, so that the text could be larger. (*Id.* at 17.)

19          These objections to KKC's notice campaign lack merit. As evidenced by Mr.

20   Etter's postings in online RV forums, there is a vibrant online community dedicated to RV

21   ownership, and KKC appropriately targeted this community in its internet advertisements.

22   The postcard notices likewise satisfy Rule 23(c)(2)(B). As KKC indicates, postcard

23   notices are regularly used by state and federal courts, including at least eleven cases in

24   which KKC has served as settlement administrator. (Robin Suppl. Decl. ¶ 9, Doc. 517.)

25   In another case that employed postcard notices, *In re Toyota Motor Corp. Unintended*

26   *Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 8:10ML 02151 JVS, 2013

27   WL 3224585 (C.D. Cal. June 17, 2013), the court dismissed an objector's demand for a

28

large-print notice by observing that "[a] good deal of information needed to be communicated to class members, and larger type would likely render class notice via postcard infeasible, thus significantly increasing mailing costs . . . ." *Id.* at 19.  Non-Settling Plaintiffs attempt to distinguish *In re Toyota Motor Corp.* by making grossly overbroad comparisons of Prius and RV owners without recognizing that in *In re Toyota Motor Corp.* concerned the owners of a wide range of other car models as well.  *See id.* at *1.  In any event, an annual study by the United States Postal Service finds that, compared to a standard letter, postcard notices are more likely to be read and to receive a response.  *The Household Diary Study*, USPS (May 2015) at Tables A3-31, A3-33, http://www.prc.gov/docs/93/93171/2014%20USPS% 20HDS %20Annual% 20Report_Final_V3.pdf.  Mailing letters to class members, therefore, would have cost more without any obvious benefit.  The Court, therefore, finds that the notice campaign was the best notice practicable under the circumstances.

## IV.   SETTLEMENT ADMINISTRATOR COSTS

The Settlement Agreement provides that the selected claims administrator will be provided reasonable payment for its services not to exceed $2,000,000.  (SA § II.D(2)(i).)  A Project Manager for KKC estimates that the total cost for the administration of the settlement, including fees incurred and future costs for completion of the administration, will total $1,124,142.63.  (Robin Supp. Decl. ¶ 3, Doc. 538.)  Settling Plaintiffs request that the Court approve a payment of $704,876.52 to KKC (Proposed Order ¶ 27, Doc. 502-2; Robin Supp. Decl. ¶ 2, Doc. 538).  After the fairness hearing, Settling Plaintiffs submitted a declaration from the claims administrator along with detailed billing records and a projection of its total costs.  (Robin Supp. Decl., Doc. 538; Monthly Billing Records, Exh. A, Doc. 538-1; Administrator Projections, Exh. B, Doc. 538-2.)  Having carefully reviewed these documents, the Court APPROVES a payment of $704,876.52 to KKC.

## V.   ATTORNEYS' FEES

Rule 23 authorizes a court to award "reasonable attorneys' fees . . . that are

1    authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  "[C]ourts have an

2    independent obligation to ensure that the award, like the settlement itself, is reasonable,

3    even if the parties have already agreed to an amount."  *In re Bluetooth Headset Prods.*, 654

4    F.3d at 941.  In the Ninth Circuit, the benchmark for a fee award in common fund cases is

5    twenty-five percent of the recovery obtained.  *See id*. at 942.  Courts must "justify any

6    increase or decrease from this amount based on circumstances in the record."  *Monterrubio*

7    *v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing *Six (6) Mexican*

8    *Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).  The Ninth Circuit

9    has identified a number of factors the Court may consider in assessing whether an award is

10   reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill

11   required and quality of work, (4) the contingent nature of the fee and the financial burden

12   carried by the plaintiffs, and (5) the awards made in similar cases.  *See Vizcaino v.*

13   *Microsoft Corp*., 290 F.3d 1043, 1048-50 (9th Cir. 2002).  Counsel's lodestar may also

14   "provide a useful perspective on the reasonableness of a given percentage award."  *Id*. at

15   1050.

16        For objectors to be entitled to a fee award, their objections must "result in an

17   increase to the common fund."  *Rodriguez v. Disner*, 688 F.3d 645, 658 (9th Cir. 2012).

18   When objectors "do not increase the fund or otherwise substantially benefit the class

19   members," they have no right to any fees, "even if they bring about minor procedural

20   changes in the settlement agreement."  *Id.* at 658-59 (citations omitted); *see Hartless v.*

21   *Clorox Co.*, 273 F.R.D. 630, 647 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th

22   Cir. 2012) (noting that an objector's benefit must be "actual and concrete not conceptual or

23   doctrinal").

24        Settling Counsel seek a total attorneys' fee and expenses award of $9,000,000, or

25   one-quarter of the monetary fund.  (Mem. at 1.)  Settling Plaintiffs request that this Court

26   apportion the fee award based on billed hours but exclude any hours Non-Settling

27   Attorneys billed after the initial term sheet was executed on July 22, 2014.  (Reply at 3,

28

                                                  36

1   Doc. 521.)  In contrast, Non-Settling Plaintiffs seek half of a lower total attorneys' fees

2   award of one-fifth of the monetary fund.  (Non-Settling Mem. at 1, Doc. 492.)  Non-

3   Settling Plaintiffs also seek compensation for their expenses.  (*Id.*)  For the reasons

4   elaborated below, the Court concludes that the circumstances do not justify a downward

5   departure from the twenty-five percent benchmark.

6          A.      **Results Achieved**

7          Settling Counsel characterize the $36,000,0000 non-reversionary Monetary Fund

8   they secured in this litigation as an "outstanding outcome" in light of the risks Plaintiffs

9   faced.  (Settling Plaintiffs' Mem. at 14, Doc. 479-1.)  Applying the current claim rate and

10  the maximum award of fees and expenses, current 1200 Series owners who submitted

11  claims would each receive around $824 over three years while N6 and N8 owners would

12  receive around $164.  (Robin Supp. Decl. ¶ 4, Doc. 517.)  Beyond this monetary fund,

13  Settling Counsel argue that the three-year extended warranty for N6 and N8 owners

14  provides real value to class members.  (Settling Plaintiffs' Mem. at 8-9.)  N6 and N8

15  owners will receive the three-year extended warranty for cooling unit repairs regardless of

16  whether they submit a claim form.  (SA § II.D(2)(ix).)  Considering Norcold sells general

17  three-year extended warranties for $199.95, if one ascribes twenty percent of the value of

18  the warranty to cooling unit repairs, then class members will receive approximately

19  $14,364,288  ($38.99 each) in additional, albeit nonmonetary, value.  (Settling Plaintiffs'

20  Mem. at 9.)  Although the benchmark in a common fund settlement should almost always

21  be based solely on monetary compensation because the value of nonmonetary

22  compensation can be easily manipulated, a court "should consider the value of the

23  [nonmonetary] relief obtained as a 'relevant circumstance' in determining what percentage

24  of the common fund class counsel should receive as attorneys' fees . . . ."  *Staton*, 327 F.3d

25  at 974 (citing *Vizcaino* 290 F.3d at 1049); *Perkins v. Linkedin Corp.*, No. 13-CV-04303-

26  LHK, 2016 WL 613255, at *14 (N.D. Cal. Feb. 16, 2016).  While the exact value of the

27  extended three-year warranty is undoubtedly difficult to quantify, the combined monetary

28

1   and non-monetary compensation achieved here "weigh in favor of granting Class

2   Counsel's request for a fee award of 25%." *Perkins*, 2016 WL 613255, at *14.

3       Separately, the Court finds that the reaction of class members does not justify a

4   downward departure from the benchmark.  Although the overall claim rate is

5   approximately eight percent, there were 45,391 timely claims submitted, only thirty-seven

6   opt-outs, and just one objector besides the eight Non-Settling Plaintiffs.  (Robin Supp.

7   Decl. ¶¶ 2, 4, Doc. 510; Oxley Letter, Doc. 512.)  Therefore, the Court finds that this factor

8   militates in favor of a benchmark award of twenty-five percent.

9       **B.    Risk of Litigation**

10      Settling Counsel acknowledge that, assuming that monetary value of the relief

11  sought in their initial complaint totaled $702-732.75 million, the settlement amounts to

12  only a small fraction (4.9-5.12%) of the maximum potential damages.  (*See* Mem. at 17.)

13  But Settling Counsel vigorously dispute the merits of this metric because there was a high

14  likelihood that class members in this case would have obtained nothing.  (Mem. at. 15-19.)

15  Without reiterating the Court's reasons for granting final approval of the settlement, both

16  Settling and Non-Settling Plaintiffs recognize that before this class settlement, Defendants

17  had been universally successful in fending off liability in individual proceedings.  (Non-

18  Settling Plaintiffs' Attorneys Fees and Costs Mot. at 5, Doc. 492.)  Even after the

19  additional discovery in the *Reis* individual action and this class action, counsel for Non-

20  Settling Plaintiffs lost his individual *Reis* suit before a Contra Costa jury.  (Jury Verdict

21  Form, Exh. 1, Doc. 503-1.)  Further, in bringing this suit, Plaintiffs faced the prospect that

22  they would be unable to certify, in whole or in part, either their twelve-state or nationwide

23  class or that Norcold would have avoided a massive judgment secured at trial through a

24  bankruptcy filing.  The Court, therefore, concludes that the considerable risks posed in

25  litigating this class action support a benchmark award of twenty-five percent.  *See Torrisi*

26  *v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir. 1993).

27      **C.    Skill Required and Quality of Work**

28

1    In this case, the attorneys' work consisted primarily of drafting the complaints,

2   conducting extensive discovery (both before class certification and after the Court

3   reopened discovery), writing the two class certification motions, negotiating both the

4   original and revised settlement, and litigating approval of the settlement (*See* Mem. at 16.)

5   On the merits, this suit implicated highly-technical questions about the mechanics of gas-

6   powered RV refrigerators and the National Highway Transportation Administration's

7   recall processes.  No less important, Plaintiffs faced the challenge of certifying a products

8   liability class spanning numerous states.  (*See* Renewed Mot. Class Cert. at 21-30, Doc.

9   117.)  Meeting this challenge, Plaintiffs' Counsel, both in their complaints and class

10  certification motions, demonstrated a deep understanding of the mechanics of RV

11  refrigerators, the governing regulatory framework, and the requirements for certifying a

12  class.  Plaintiffs' Counsel also conducted exhaustive discovery both on the merits and on

13  Norcold's ability to pay a judgment: they reviewed over 166,000 documents, deposed

14  numerous representatives of Norcold, and filed several motions to compel.  (Robinovitch ¶

15  13, Doc. 480.)  To support their class certification motion, Plaintiffs' Counsel obtained

16  experts on the NHTSA recall process and RV gas refrigerators.  (*See* Docs. 122, 123, 124.)

17  During the settlement approval process, both Settling and Non-Settling Plaintiffs retained

18  financial experts to evaluate Norcold's ability to pay.  (Robinovitch ¶ 65, Doc. 480;

19  Brandlin ¶ 4, Doc. 315; Notice of Lodging, Doc. 321.)

20      Non-Settling Counsel counter that this suit did not involve a motion to dismiss or a

21  motion for summary judgment, and Plaintiffs had their first class certification motion

22  stricken for failure to comply with the Court's deadlines.  (Opp'n at 1, Doc. 508.)  But it

23  would be peculiar to penalize Plaintiffs' Counsel for Defendants' decision not to file a

24  motion to dismiss — it may equally suggest that Plaintiffs' First Amended Complaint was

25  well-pleaded.  Similarly, Plaintiffs' fully-briefed motion for class certification was a well-

26  researched, vigorous presentation.  Besides, as the Supreme Court has observed, discovery

27  often accounts for the great bulk of the expense of litigation, and this suit required

28

1  extensive discovery.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Similarly,

2  Counsel's failure to conform to the Court's page limitations, while unfortunate, is not so

3  troubling as to justify a downward departure in this case, especially considering

4  Defendants' comparable skirting of the Court's rules in their Opposition brief.  (*See* Order,

5  Doc. 116.)  And, as apparent from a comparison of the two motions, Plaintiffs' Counsel

6  made the best of the circumstance by markedly refining their arguments.  (*Compare* Mot.

7  Class Cert., Docs. 52, 64 *with* Renewed Mot. Class Cert., Doc. 117.)  In sum, the Court

8  believes that the highly complex nature of this suit, both technically and procedurally,

9  militates in favor of granting Settling Counsel's requested twenty-five percent award.

10       **D.**    **Contingent Nature of the Fee**

11       Plaintiffs' Counsel took this case on a contingent basis and have invested so far

12  over 11,940.46 billed hours and $262,284.06 in claimed expenses litigating this case.  (*See*

13  *infra*, at 42.)  Plaintiffs' Counsel have received no compensation for their efforts during the

14  course of litigation, which they undertook despite the substantial risk that the Plaintiffs

15  would not recover anything.  (*See id.*)  "Courts have long recognized that the attorneys'

16  contingent risk is an important factor in determining the fee award and may justify

17  awarding a premium over an attorney's normal hourly rates."  *Monterrubio*, 291 F.R.D. at

18  457 (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir.

19  1994)).  This factor, when coupled with the risks presented by taking on this suit, weighs

20  in favor of a twenty-five percent award.  *See, e.g.*, *City of Roseville Employees' Ret. Sys. v.

21  Micron Tech., Inc.*, No. 06-CV-85-WFD, 2011 WL 1882515, at *7 (D. Idaho Apr. 28,

22  2011), *aff'd*, 484 F. App'x 138 (9th Cir. 2012) (observing that counsel's prosecution of a

23  case for "four years without compensation" justified a benchmark award).

24       **E.**    **Comparable Cases**

25       The Court finds that a twenty-five percent award would be commensurate to awards

26  in other cases.  *See, e.g.*, *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir.

27  1993) (justifying a 25% benchmark award by noting the risks posed by defendant's

28

financial condition); *Hester v. Vision Airlines, Inc.*, No. 2:09-CV-00117-RLH, 2014 WL 3547643, at *11 (D. Nev. July 17, 2014) (observing, in approving a 30% fee award, that defendant's "threatened bankruptcy" was a "significant factor"). For instance, in *Chambers v. Whirlpool Corp.*, a case that involved allegedly defective dishwashers that caught fire, the district court awarded $14,814,994.70 in attorneys' fees based on a 1.68 lodestar multiplier after the parties reached a largely coupon-based settlement. Case No. 11-1733, Doc. 351, at *4, *34 (C.D. Cal. Oct. 11, 2016). Here, the Court finds this settlement to be considerably more favorable to class members because compensation will be primarily monetary. In addition to these case comparisons, Settling Plaintiffs submit a study by Brian Fitzpatrick that concluded that the median award in class actions between 2006 and 2007 was 25% with the mean being 25.6%. (Mem. 21-22.) The Court, therefore, concludes that this factor supports a benchmark award in this case.

### F.      Lodestar Cross-Check

To determine the reasonableness of a fee award, courts may compare the requested percentage-of-the-common-fund with counsel's lodestar calculations. *Vizcaino*, 290 F.3d at 1050-51. The lodestar cross-check first requires the court to determine whether the hourly rates sought by counsel are reasonable. "[T]he district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). This determination "is not made by reference to rates actually charged [by] the prevailing party." *Id*. The fee applicant bears the burden of showing that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 980 (9th Cir. 2008) (citation omitted). "Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge*

1  *Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  The Court may also "rely on its own familiarity

2  with the legal market."  *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).  As a

3  general rule, the forum district represents the relevant legal community.  *See Gates v.*

4  *Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

5       Settling Counsel assert they have spent 8,658.91 hours litigating this action so far

6  (*see* Billing Records, Docs. 480-12 at 128, 491-14 at 38, 491-16 at 13), while Non-Settling

7  Plaintiffs claim they have spent 3,281.55 hours (Non-Settling Plaintiffs' Mem. at 14, Doc.

8  492.)  In Settling Counsel's billing records, counsel used blended rates between $100-175

9  for paralegals, $275 to $450 for associates, and $500 to $775 for partners.  (Robinovitch

10  Decl. ¶ 133; Billing Records at 128, Doc. 480-12.)  Before the firm merged with

11  Zimmerman Reed, Ridout Lyon + Ottoson used comparable billing rates.  (*See* Exh. 2, 4,

12  Doc. 491.)  Mr. Beard has charged all his time at a $600 per hour rate (Beard Decl. ¶ 51,

13  Doc. 493), while Hagens Berman used blended rates between $150-172 for paralegals,

14  $575 to $600 for of Counsel attorneys, and $652 to $900 for partners.  (Loeser Decl. ¶ 9,

15  Doc. 494.)

16       Although the Court cannot calculate an exact lodestar multiplier because Non-

17  Settling and Settling Counsel dispute which hours should be counted, the Court is able to

18  construct the following approximate range:

19

20

21

22

23

24

25

26

27

28

| | Hours Billed Lodestar | Expenses | Settling Plaintiffs' Proposal | Accounting for All Hours |
|---|---|---|---|---|
| **Zimmerman Reed, LLP** | $4,233,553.55 (8,658.91 hrs.) | $180,462.45 | $4,233,553.55 (8,658.91 hrs.) | $4,233,553.55 (8,658.91 hrs.) |
| **Law Offices of Terrence Beard** | $1,760,070.00 (2,933.45 hrs.) | $63,552.93 | $634,800 (1,058 hrs.) | $1,760,070.00 (2,933.45 hrs.) |
| **Hagens Berman Sobol Shapiro, LLP** | $208,652.40 (348.10 hrs.) | $18,268.68 | $0.00 | $208,652.40 (348.10 hrs.) |
| Lodestar Multiplier | | $262,284.06 | **1.78**[10] ($5,048,816.00) | **1.39** ($6,464,560.01) |

While the Court may take issue with some of the hours and billed rates Plaintiffs' Counsel submit, the final lodestar multiplier in this case will be well within the appropriate bounds for class action litigation. *See, e.g.*, *Vizcaino*, 290 F.3d 1043, 1051 (9th Cir. 2002) (observing that in a majority of collected cases the lodestar multiplier fell between 1.0 and 3.0); *Perkins*, 2016 WL 613255, at *16 (N.D. Cal. Feb. 16, 2016) (finding that a reported lodestar multiplier of 1.45 was "within the range of reasonableness"); *Chambers v. Whirlpool Corp.*, Case No. 11-1733, Doc. 351 (C.D. Cal. Oct. 11, 2016) (approving of a 1.68 multiplier in an award based solely on the lodestar method); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *6 (N.D. Cal. Aug. 3, 2016) (1.96 multiplier).

One final consideration supports approval of a benchmark award here: the requested fee award includes expenses, even though plaintiffs regularly seek a separate award for

---

[10] Because Settling Plaintiffs do not indicate which, if any, of Mr. Beard's expenses should be counted, the Court has excluded all of Mr. Beard's expenses for purposes of making this lodestar projection.

1   expenses. *See Perkins*, 2016 WL 613255, at \*16; *see also Wininger v. SI Mgmt. L.P.*, 301

2   F.3d 1115, 1121 (9th Cir. 2002). Settling Counsel, therefore, seek slightly less than the

3   benchmark percentage. *See Perkins*, 2016 WL 613255, at \*16.

4        In sum, having carefully considered the relevant factors as well as the lodestar

5   cross-check, the Court finds that an award of twenty-five percent, or $9 million, is

6   appropriate and reasonable in this action. The Court, therefore, GRANTS Settling

7   Counsels' Motion for a benchmark award of twenty-five percent. At the fairness hearing,

8   Settling and Non-Settling Counsel were willing to mediate the apportionment of attorneys'

9   fees. As such, the Court will defer consideration of how to equitably apportion the

10   attorneys' fees award.

11   **VI.   <u>SERVICE AWARDS</u>**

12        Service awards are "discretionary . . . and are intended to compensate class

13   representatives for work done on behalf of the class, to make up for financial or

14   reputational risk undertaken in bringing the action, and, sometimes, to recognize their

15   willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d

16   948, 958-59 (9th Cir. 2009) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463

17   (9th Cir. 2000)). "To [further] assess whether an incentive payment is excessive, district

18   courts balance 'the number of named plaintiffs receiving incentive payments, the

19   proportion of the payments relative to the settlement amount, and the size of each

20   payment.'" *Monterrubio*, 291 F.R.D. at 462 (quoting *Staton*, 327 F.3d at 977). Courts

21   must be "vigilant in scrutinizing all incentive awards to determine whether they destroy the

22   adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d

23   1157, 1164 (9th Cir. 2013).

24        In this case, Settling Plaintiffs request service awards of one hundred dollars per

25   hour but, as the settlement agreement provides, no more than $7,500 each:

26

27

28

| Name | Fee Request |
|------|-------------|
| James Pearce | $6,750 |
| Charles Chow | $4,415 |
| Ray Burkhead | $3,250 |
| Randy Dupree | $7,500 |
| Linda Pierson | $4,400[11] |
| Craig Post | $7,500 |
| Kathleen Frederick | $7,500 |
| George Frederick | $7,500 |
| John Robinson | $7,500 |
| Gordon Williamson | $1,580 |
| **Total** | **$57,895** |

(*See* Dupree Decl. ¶¶ 17-18, Doc. 487; Robinson Decl. ¶¶ 17-18, Doc. 483; G. Frederick Decl. ¶¶ 16-17, Doc. 482; K. Frederick Decl. ¶¶ 16-17, Doc. 486; Burkhead Decl. ¶¶ 16-17, Doc. 488; Chow Decl. ¶¶ 15-16, Doc. 489; Pearce Decl. ¶¶ 16-17, Doc. 490; Williamson Decl. ¶ 15-17, Doc. 481; Pierson Decl. ¶¶ 16-17, Doc. 486; Post Decl. ¶¶ 16-17, Doc. 485.)  Seven Non-Settling Plaintiffs, in turn, request service awards of one hundred dollars per hour but do not cap their requests at $7,500 each:

---

[11] While Settling Plaintiffs' proposed order requests $7,500 for Linda Pierson, her declaration seeks compensation for only 44 hours ($4,400).  (*Compare* Pierson Decl. ¶ 17, Doc. 5 *with* Non-Settling Plaintiffs' Mot. at 4, Doc. 486.)  The Court will award the lesser amount included in declaration ($4,400).

| Name | Fee Request |
|---|---|
| Brian McBride | $15,531 |
| Emil Vargo | $11,191[12] |
| Paul Kahler | $7,500 |
| Fran Curtis | $7,500 |
| Jeffery and Susan Etter | $35,325 |
| Richard Kaylor | $7,500 |
| **Total** | **$83,811** |

(*See* Etter Decl. Timesheet, Exh. A, Doc. 496; Vargo Decl. Timesheet, Exh. A, Doc. 501; Kaylor Decl. ¶ 4, Doc. 500; Curtis Decl. ¶¶ 4-5, Doc. 497; Kahler Decl. ¶¶ 4-5, Doc. 498; McBride Decl. Timesheet, Exhs. A, B, Doc. 499).

As an initial matter, the Court agrees with Non-Settling Plaintiffs that the settlement agreement does not constrain this Court's inherent equitable authority under the common fund doctrine. *See, e.g.*, *Rodriguez*, 688 F.3d at 654; *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (Posner, J.) (holding that "principles of restitution" authorize the awarding of fees to objectors). Here, although they continue to object to the settlement,[13] Non-Settling Plaintiffs were at one point substantial participants in a suit that has resulted in a sizeable monetary fund. Principles of restitution, therefore, counsel in favor of awarding Non-Settling Plaintiffs compensation for their efforts. *See Reynolds*, 288 F.3d at 288. Likewise, although Brian McBride is not a member of the settlement class, he also was an active participant in this class action — for instance, he was deposed and had to respond to interrogatories and requests for production. (*See* McBride Decl.

---

[12] Non-Settling Plaintiffs' brief seeks $11,191 for Mr. Vargo, but his declaration requests only $8,225. (*Compare* Vargo Decl. ¶ 5, Doc. 501 *with* Non-Settling Plaintiffs' Mot. at 4, Doc. 495.)

[13] To be clear, nothing in the settlement agreement precludes class representatives from objecting to the settlement agreement. (*See* SA §§ II.C, VII.E.)

1  Timesheet, Exh. A, Doc. 499.)  Thus, the Court concludes that Mr. McBride's efforts on

2  behalf of class members merit an incentive award.

3          Here, Plaintiffs have invested considerable time and effort in prosecuting this class

4  action over nearly four years.  *In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit*

5  *Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 471 (C.D. Cal. 2014) ("When litigation

6  has been protracted, an incentive award is especially appropriate.").  The Court thus finds

7  Settling and Non-Settling Plaintiffs' requests for incentive awards based on a $100 per

8  hour rate appropriate.  The Court, however, must ensure that these incentive awards do not

9  consume an outsized fraction of the monetary fund or become "grossly disproportionate"

10  to what class members will receive under the agreement.  *See, e.g.*, *Richardson v. THD At-*

11  *Home Servs., Inc.*, No. 1:14-CV-0273-BAM, 2016 WL 1366952, at *14 (E.D. Cal. Apr. 6,

12  2016).  Thus, the Court will cap all incentive awards at a maximum amount of $7,500 per

13  named Plaintiff, thereby reducing Brian McBride and Emil Vargo's incentive awards to

14  $7,500 each.  As Jeffery and Susan Etter were both named Plaintiffs, their incentive

15  awards will be limited to $7,500 each ($15,000 total).

16          Under this cap, the Court concludes that neither the incentive awards individually

17  nor the total fraction of the monetary fund dedicated to incentive awards (0.16% for the

18  Settling Plaintiffs and 0.15% for the Non-Settling Plaintiffs) is excessive.  *See, e.g.*, *In re*

19  *Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (approving of

20  incentive awards that were 417 times greater than class members' compensation); *In re*

21  *U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (affirming incentive awards

22  totaling 0.33% of settlement fund); *In re Toys R Us-Delaware, Inc.—Fair & Accurate*

23  *Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 472 (C.D. Cal. 2014) (granting

24  $5,000 incentive awards when the class members would receive up to $30 in vouchers);

25  *Rosmina Brown v. Hain Celestial Grp., Inc.*, No. 3:11-CV-03082-LB, 2016 WL 631880, at

26  *9 (N.D. Cal. Feb. 17, 2016) (granting named plaintiffs incentive awards of $7,500 each,

27  totaling 0.20% of settlement fund); *Custom LED, LLC v. eBay, Inc.*, No. 12-CV-00350-

28

1    JST, 2014 WL 2916871, at *10 (N.D. Cal. June 24, 2014); *Bellinghausen v. Tractor*

2    *Supply Co.*, 306 F.R.D. 245, 268 (N.D. Cal. 2015) (awarding named plaintiff $10,000 in

3    compensation, amounting to 1% of settlement fund).  Although seventeen named Plaintiffs

4    will be receiving incentive awards, this total is reasonable because this was a nationwide

5    class action involving multiple models of refrigerators and the Court has decided to grant

6    Non-Settling Plaintiffs (*i.e.*, objectors) incentive awards as well.

7    **VII.   CONCLUSION**

8         The Court finds the settlement to be fair, reasonable, and adequate, and accordingly

9    OVERRULES all objections and GRANTS final approval of the settlement.  The Court

10   GRANTS Settling Plaintiffs' Motion for an award of one-quarter of the settlement fund

11   ($9 million) in attorneys' fees and expenses.  The Court GRANTS incentive awards of

12   $7,500 to Randy Dupree, Craig Post, Kathleen Frederick, George Frederick, John

13   Robinson, Brian McBride, Emil Vargo, Paul Kahler, Fran Curtis, Jeffery Etter, Susan

14   Etter, and Richard Kaylor.  Finally, the Court GRANTS awards of $6,750 to James Pearce,

15   $4,415 to Charles Chow, $3,250 to Ray Burkhead, $4,400 to Linda Pierson, and $1,580 to

16   Gordon Williamson.

17        At the fairness hearing Plaintiffs' attorneys expressed a willingness to mediate the

18   apportionment of the attorneys' fees award.  Accordingly, the Court ORDERS Plaintiffs'

19   attorneys to attempt to mediate fee allocation.  Settling and Non-Settling Counsel shall

20   submit a joint stipulation within seven (7) days of the issuance of this order informing the

21   Court of the name of the agreed-upon mediator and the date of the mediation, which shall

22   take place no later than November 30, 2016.  Plaintiffs' attorneys shall promptly notify the

23   Court if they are unable to reach agreement, and the Court will issue a minute order

24   specifying what additional documentation the Court will need to allocate the attorneys'

25   fees award equitably.

26

27   DATED: October 24, 2016

                                                    _____
28                                                   JOSEPHINE L. STATON
                                                     UNITED STATES DISTRICT JUDGE